IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NATCOM BANKSHARES, INC.,

                    Petitioner,

     v.

BRENDA L. JOHNSON, MURRAY
R. JOHNSON, DIANA T. JOHNSON,
T.R.J., a minor, M.P.J., a minor, M.S.J.,
a minor and T.P.J., a minor,

                    Respondents.

OPINION AND ORDER

12-cv-334-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case arises under Wisconsin statutes enacted to protect the rights of dissenting shareholders. Wis. Stat. §§ 180.1301-31. Respondents Brenda L. Johnson, Murray R. Johnson, his wife, Diana T. Johnson, and minors T.R.M., M.P.J., M.S.J. and T.P.J. dissented from a decision by the board of directors of petitioner Natcom Bankshares, Inc. to convert petitioner from a Subchapter C corporation to a Subchapter S corporation under the Internal Revenue Code. When they proffered their shares for payment under the statutes, petitioner paid them $780 a share for their stock, an amount respondents found did not amount to "fair value" under Wis. Stat. § 180.1325. Petitioner then brought this suit under Wis. Stat. § 180.1330 to obtain a judicial determination of fair value.

Jurisdiction exists to hear the suit under 28 U.S.C. § 1332. The parties are of diverse citizenship and more than $75,000 is in dispute.

1

I conclude that petitioner has shown that its payment of $780 per share was a fair value of the stock as of December 2011.  Neither respondents' criticism of petitioner's experts' valuation work nor their reasons for a higher value are convincing.

In addition, I conclude that respondents are entitled to interest on the value of their shares for the period between December 29, 2011, the day on which the conversion was effectuated, until January 20, 2012, when they received payment, as well as to interest on the withheld interest payments from December 29, 2011 until they have satisfied their interest obligation.  The interest rate is the prime rate then in effect, 3.25%.

Respondents are not entitled to fees and costs because they have not shown that petitioner acted arbitrarily, vexatiously or in bad faith.  Petitioner made consistent efforts to keep respondents informed of the conversion process; it arranged for the preparation of three expert reports to determine a fair value for its shares; and it followed the statutory procedure to the letter.  For its part, petitioner have not shown that respondents acted in bad faith so as to entitle petitioner to fees and costs.  Although respondents were not cooperative with petitioner in the conversion process and made aggressive efforts to increase the value of their shares, more than this is required to show bad faith under the statute.

Finally, I am sustaining petitioner's objections to the admission of respondents' exhibits 534 and 549 on the ground of relevance.  The exhibit list is amended to show that Exhibits 615 and 616 are received, with the exception of the answer to interrogatory no. 14 of exhibit 615 and the answer to interrogatory no. 1 of exhibit 616.  Respondents never moved for the admission of exhibits 510, 514, 550, 560, 600-603, 606-07, 620 and 624,

so they are not in evidence.

From the evidence adduced at trial and the parties' stipulation of uncontested facts, I find the following facts.

FACTS

I. BACKGROUND

Petitioner Natcom Bankshares, Inc. is a Wisconsin banking corporation with its principal place of business in Superior, Wisconsin. Respondent Brenda L. Johnson is a citizen of Minnesota; respondents Murray R. Johnson and Diana T. Johnson and their children, T.R.J., M.P.J., M.S.J. and T.P.J., are citizens of Illinois.

Petitioner owns 100% of the outstanding shares of National Bank of Commerce, a bank that provides primarily commercial banking services in Wisconsin and Minnesota. In 2010, it began considering a conversion to a Subchapter S corporation from its current status as a Subchapter C corporation under the Internal Revenue Code so as to eliminate its corporate taxes. The timing seemed propitious because the Office of the Controller of the Currency was ready to lift the formal agreement it had imposed on the bank in January 2010 because of concerns about the quality of the bank's loans. While it was in place, petitioner had been barred from making distributions to its shareholders, was subject to extensive reporting requirements and was required to reduce its inventory of bad loans.

The conversion involved a reduction in the number of petitioner's shareholders: stockholders who neither owned at least 50 shares nor were members of a family that owned

at least 50 shares would have their shares redeemed.  This mandatory redemption did not apply to respondents, all of whom owned at least 50 shares or were members of a family that owned at least 50 shares.  At the time the board started thinking about conversion, it believed that it was not in a position to buy out respondents because of the size of their holds and believed that their agreement was essential to the success of the conversion.

The board hired the law firm of Gerrish McCreary Smith PC to advise it on the conversion.  The firm had experience in this area and held itself out as having a good relationship with respondents Brenda Johnson and Murray Johnson.  Trial tr., 1-A-20.  The Gerrish firm solicited proposals from several appraisal firms and chose Thomas Mecredy of Vining Sparks IBG, L.P., to make a determination of the fair value of petitioner's outstanding common stock.  1-A-24.

Both Jeff Gerrish and James Jarocki, chairman of petitioner's board, met with respondents Brenda Johnson and Murray Johnson separately during the summer of 2011 to explain the conversion plan to them.  Both Jarocki and Gerrish told respondents that the plan would not go forward if the two of them opposed it.  1-A-20-21, 22.

Mecredy visited petitioner on August 30, 2011, about 11 days after giving the Gerrish firm a copy of his valuation report, in which he concluded that the fair value of petitioner's stock was $750 a share as of June 30, 2011.  Petitioner and some members of its board received a copy of the report on August 30, 2011, but petitioner did not communicate with the firm directly or indirectly.

In October 2011, respondents' counsel advised the board that Brenda Johnson would

not be supporting the conversion but would consider an offer for her shares outside the conversion process.  1-A-26-27.  Respondents' counsel did not identify any objections to Mecredy's valuation.

The board met on October 25 and decided to go ahead with the conversion, still believing that it could not go forward if respondents continued to object, 1-A-30-31, but starting to explore opportunities for funding if respondents chose to dissent.  1-A-31.  The board set the fair value of petitioner's stock at $780 for the purpose of the conversion, after deciding to add $30 to the value of each share, based on the approximate $30 a share increase in petitioner's book value, representing retained earnings for the period between June 30 to December 1, 2011.  1-A-29.  At the time petitioner's book value was $834.  Exh. 77.  Petitioner did not obtain an updated appraisal from Vining Sparks.  The board members discussed discounting the amount slightly to reflect the fact that the June 30th evaluation showed a slight discount to book value but chose not to in the interest of fairness.  1-A-30.

Not all of the board members had read the Vining Sparks report before voting on the valuation figure.  1-A-85.  The board members did not review the report to determine whether they agreed with the method or assumptions employed by Mecredy and neither Mecredy nor petitioner provided them any analysis of the report.  1-A-95.

On or before October 25, 2011, board chairman Jarocki met with Brenda Johnson and told her that if she wanted to sell, he knew people who were buyers of bank stock and could help her find a buyer for her stock.  I-A-32.  At the time he told her that the price would probably be less than book value because that was where banks were trading at the

time and that was the conclusion of the appraiser.  Id.

In November, petitioner notified its shareholders that a special shareholders' meeting would be held on December 1, 2011 to vote upon the conversion to Subchapter S.  Trial exh. #77.  The notice advised the shareholders that they would be entitled to assert dissenters' rights under the Wisconsin statutes and included a copy of the sections applicable to the exercise of dissenters' rights.  Before the conversion went into effect, the board never told respondents Murray Johnson and Brenda Johnson that petitioner would go forward with the plan even if they dissented.  At the time, members of petitioner's board of directors owned more than 41% of the common stock; respondents' holdings of 14,002 shares represented about 19.4% of the 72,000 shares of petitioner's stock.

In November 2011, respondents notified petitioner that they dissented from the proposed transaction and intended to demand payment for their 14,002 shares of petitioner's common stock if the proposed transaction was effectuated.  Tr. Exh. 78.  At the December 1, 2011 special meeting, a majority of the stock was voted in support of the conversion.  The holders of 51,466 shares voted for the conversion; the holders of 14,663 shares voted against it; the holders of another 1128 abstained; and 4,743 shares were unrepresented.

As of December 6, 2011, board chairman Jarocki did not know Murray Johnson's position on remaining a shareholder.  He emailed Murray on December 7 to ask whether there was a price at which he would sell.  1-A-37.  On December 9, 2011, petitioner sent respondents written dissenters' notices under Wis. Stat. § 180.1322.

6

Counsel for respondents wrote petitioner on December 16, 2011 to say that respondents would be willing to sell their stock for $925 a share, payable at closing in immediately available funds.  1-A-39; Tr. Exh. 93.  Respondents' attorney informed petitioner's counsel that respondents had engaged Southard Financial, a financial appraisal firm, to review the June report and that Southard had pointed out several significant problems with the appraisal that had caused Vining Sparks to undervalue petitioner's shares. According to counsel, Southard Financial had concluded that Vining Sparks had understated petitioner's fair value by at least 25%.  (In fact, Southard Financial had done no valuation work for respondents at this time.  3-A-4, 9)  With the increase in petitioner's retained earnings since June 30, 2011, respondent's counsel contended that the fair value would exceed $960 a share.  Tr. Exh. 93 at 2.

Jarocki viewed the $925 demand as not worth pursuing because it was so much higher than anything the board would consider.  Id.  In the interim, the board had been working on finding funding for purchase of the shares through loans from another bank and from some new shareholders and current shareholders.  1-A-40.  At the time, the board assumed it would not have to pay interest on the payments because it would be paying respondents in full when they presented their shares.  The December 16, 2011 letter from respondents' counsel did not cause petitioner to consult with Mecredy again before January 20, 2012, when petitioner told respondents that its valuation was $780 a share.

The conversion was effectuated on December 29, 2012.  On January 20, 2012, respondents proffered their shares.  Petitioner paid them $780 a share for their stock but did

not pay them interest.  Four days later, petitioner provided respondents audited financial statements for 2010; non-audited interim consolidated financial information as of September 30, 2011; a statement of its estimate of the fair value of respondents' shares; a statement that it was not remitting interest on respondents' shares because it had immediately remitted payment for those shares upon receipt of their common stock share certificates and Affidavit of Lost Stock Certificate; a statement of their right to demand payment under Wis. Stat. § 180.1328 if they were dissatisfied with the payment; and a copy of Wis. Stat. §§ 180.1301 to 180.1331.  Tr. Exh. 91.

In a letter from counsel dated March 16, 2012, respondents notified petitioner that they estimated the fair value of their shares to be $995 a share and they demanded additional payments of $215 a share, plus interest at an annual rate of 3.25% retroactive to December 29, 2011.  Tr. Exh. 38.  Respondents explained the basis for their fair value estimate and provided petitioner a preliminary analysis prepared by Southard Financial.  Id. Petitioner did not amend its estimate, but filed this action on April 10, 2012 under Wis. Stat. § 180.1330.

Between June 2011 and February 27, 2012, Todd Johnson was a member of petitioner's board of directors.  He is the brother of respondents Murray Johnson and Brenda Johnson and, with his immediate family, owns about 35% of petitioner's stock.  Two other board members work for Todd Johnson and report directly to him.  Another director is a friend and serves on the board of Charter Films, of which Todd Johnson is chairman and CEO.

Petitioner remained profitable throughout the recession.  While the bank was under the formal agreement with the Office of the Comptroller of the Currency, it improved its loan review process, which had the effect of improving its asset portfolio.  The bank reduced its substandard loans and investments by 60% in 2011.  Its 2011 board-approved budget projected positive growth for 2012, 2013 and beyond.  In February 2012, the board chairman reported that petitioner had reduced its problem assets by two-thirds over the preceding 12 months.

As of December 2011, petitioner's board believed that petitioner had a bright future; Todd Johnson reported that petitioner had achieved extraordinary success; and it was the largest locally owned bank in its market by a factor of two.  In January 2010, petitioner's end of the month book value was $765.72; in December 2011, it was $825.07.

When Lawrence Kappes retired as petitioner's president in January 2010, shareholders who called to inquire about share prices were informed of recent known transaction prices.  His replacement changed the policy, saying that "inquiries into market value of the stock [were to be] answered by providing the book value per share, calculated based upon the most recently available month-end financial statements."  Despite this general rule, petitioner sometimes provided recent transaction information to its directors.

On November 2, 2012, respondents disclosed a report by their expert witness, David Harris, containing his opinion that, as of December 29, 2011, the fair value of petitioner's stock was $916 a share.  Petitioner asked Mecredy to update his August 2011 report to include information about petitioner's finances between June and December 2011.  Later,

petitioner's trial counsel hired William Pommerening to prepare a formal valuation of petitioner.

## II. EXPERT EVALUATIONS

### A. Vining Sparks

Thomas Mecredy of Vining Sparks did the initial evaluation of the fair value of petitioner and concluded in August 2011 that it was $750 a share.  Thereafter, in preparation for trial, each side hired a new expert to undertake an independent evaluation of petitioner and petitioner asked Mecredy to update his report to include the full year.

Mecredy is an experienced evaluator, who has done about 100 evaluations of community bank stock a year for the last 20 years.  1-A-136.  He was a new arrival at Vining Sparks when he did the evaluation of petitioner in the summer of 2011.  1-A-137.  No one from petitioner or Vining Sparks tried to influence his conclusion about the value of petitioner's stock or tell him what particular number to come out with.  Id.  He did nothing in his valuation of petitioner that was different from what he did in performing valuations of corporations similar to petitioner.  1-A-139.

Of the three different approaches to a valuation, asset based, income and market, Mecredy used the income and market approaches.  The latter consisted of determining a marketable minority price and then applying a control premium to reflect the fact that in a situation such as a conversion or a merger, the fair value of the share price is not discounted for lack of control.

10

1. <u>Market approach</u>

a. Marketable minority

Mecredy began this part of his analysis by looking at the price of stocks of publicly traded companies in petitioner's geographic region.  He put together a "peer group" of publicly traded companies that met four criteria: (1) they were in the same geographic region (Wisconsin and Minnesota); (2) they had total assets between $500 million and $1 billion; (3) they did not have a Subchapter S election as of June 30, 2011; and (4) they were comparable to petitioner.  Tr. Exh. 2 at internal page 3.  He then selected a different group of "guideline companies," which were publicly traded banking organizations in Wisconsin and Minnesota with a return on assets greater than zero.  <u>Id</u>.  In choosing the guideline companies, Mecredy searched for publicly traded companies in these two states because he believes that different areas of the country have substantially different performances and for that reason he has never done a fair value analysis without considering geography.  1-P-4-5.

Mecredy looked at publicly traded companies in Minnesota and Wisconsin and considered book value, tangible book value, 2010 earnings and 2011 estimated earnings. 1-P-3.  Three of the 13 banks he chose for the guideline company group were considerably larger than petitioner.  Respondents criticized their inclusion in the group, but omitting them would have decreased petitioner's appraised value. 1-A-146.

When Mecredy compared the two groups (peer group and guideline public companies) with petitioner for the six months ending on June 30, 2011, he found that on annualized return on assets, the peer group had median ratios of 0.59% and the guideline

11

companies had a ratio of 0.71%, compared to petitioner's 0.79%.  Petitioner had 7.21%
annualized return on equity compared to the peer group's median ratio of 7.00% and the
guidelines companies' median ratio of 8.58%.  Tr. Exh. 54, internal p. 4. The three groups
had comparable mixes of loans.  For petitioner, 16.51 % were commercial and 80.58% were
real estate; the peer group had 14.25% commercial loans and 79.91% real estate loans for
the same period.  Id. at internal page 5.  Petitioner's nonperforming assets equaled 4.68%
of total assets as of September 30, 2011; the median for the peer group was 4.12%; the
median for the guideline companies was 3.29%.  Id. at internal p. 6.  Petitioner's total equity
on June 30, 2011 was 11.35% of petitioner's total assets, exceeding the median equity to
assets ratio of 8.18% for the peer group and the median equity to assets ratio of 8.34% for
the guideline companies.  Id.

As part of his market approach, Mecredy used the recent trading prices of petitioner's
stock.  1-A-143.  He gave 25% of the final weight for his market approach to these prices.
1-A-144.  Respondents challenged the use of these trades as a basis of comparison, pointing
out that they included a large purchase of shares by Todd Johnson from an elderly widow
for an unusually low price and that buyers and sellers rarely had sufficient information  when
buying petitioner's stock, but if Mecredy had not included the recent trading prices, his final
estimate of fair value would have been lower than $750.  He would have had the same result
had he not weighted the factor at 25%.  Id.

Mecredy concluded from his market approach that a marketable minority value of
petitioner's stock was $595 a share.  He then applied a market premium for control of 25%

to arrive at a fair market value of $743.75.  The market premium was lower than the 37% median premium paid in the acquisition of publicly traded companies between January 1, 2008 and December 28, 2011, but, as Mecredy pointed out in his report, acquisitions carry a higher premium because they offer more opportunities to reduce the costs of the acquired bank and increase the company's existing business lines.  Tr. Exh. 2 at 19.

b. Comparable transactions

From the 2010 and 2011 sales of publicly traded companies located in Wisconsin and Minnesota, Mecredy found that publicly traded banks in these two states had sold for about 10% to 15% over tangible book value.  1-P-5.  ("Tangible book value" does not include good will.)  These results suggested to him that fair value of a privately held bank holding company would be between about 90 or 95% of tangible book value in a sale, 1-P-6, and bolstered his opinion that his valuation of $750 a share as of June 30 was appropriate for petitioner.  1-P-7.

2. Income approach

In arriving at his estimated value, Mecredy gave the market approach 80% of the weight in his total valuation.  The remaining 20% came from the income approach, for which he used the discounted cash flow method.  Mecredy used petitioner's projections of its future performance to determine earnings, considered only those earnings exceeding the 8% of capital that is the minimum acceptable amount the bank was required to maintain.

13

He then discounted the cash flows at an appropriate discount rate.  1-P-8.  In other words, he projected the earnings stream out five years and discounted it back to arrive at a discounted cash flow value.  Doing this gave him a marketable minority value of $559.65 to which he applied a 25% premium to reach a price of $750.  1-P-9.

3. Supplemental report

In a followup report requested by petitioner's counsel and dated December 29, 2011, Tr. Exh. 2, Mecredy concluded that the value of the shares should be $743 a share.  1-P-10. In that report, he continued to give a weight of 25% of the market approach to the prices paid in recent purchases of petitioner's stock, 1-P-12, but he increased book value to reflect higher projected earnings for the end of 2011 and for 2012.  In response to criticism from respondents' expert, he eliminated the larger of the comparable companies he had used as guideline companies in June.  Because the larger companies traded at higher premiums than the smaller Wisconsin and Minnesota companies, eliminating them lowered the evaluation amount,1-P-13, and offset the increase in book value.  Mecredy used the same discount rate in both valuations.  He noted that some of the risk factors had changed, but he remained convinced that the overall risk profile had not changed from June to December.  1-P-13-14.

B. William Pommerening

William Pommerening was retained by petitioner's trial counsel in February 2012 to prepare a formal valuation of petitioner.  He is the chief executive officer of RP Financial,

14

a financial consulting and valuation firm.   He has served as the principal valuation expert in more than 250 common stock valuations.   For his work on behalf of petitioner, he collected extensive financial data and reviewed the Vining Sparks report, but did not visit the bank or meet with any officers from the bank or members of petitioner's board.   His conclusion was that the fair value of a share was $720.

Unlike Mecredy, who used both market and income approaches for his report, Pommerening used only the market approach, for two reasons.   First, he thinks that the trading prices paid in actual transactions are more reflective of the real value of a company and second, the income approach requires a number of assumptions, each of which adds an element of uncertainty to the evaluation.   1-P-98-99.

In performing his market approach, he employed three different methods in an effort to quantify a value for which there was no actual market.   In his opinion, value resided somewhere between a trading value (the price at which minority shares would trade in the public market) and a full acquisition value.   1-P-91.   ("Minority shares" refers to the typical open market stock transaction, which is a purchase of a minority interest in a company, lacking any element of control.)   Pommerening defines "fair value" as the value of an entire corporation, absent any consideration of the effects of the pending transaction or of any synergy that might be derived by an acquirer, flowing from such things as combining administrative services, consolidating branches, eliminating one board of directors or gaining access to new markets.   1-P-93-94.

15

1. <u>Public equivalent value method</u>

      Pommerening's first market value method was to determine the *public equivalent value*, which is essentially a trading value for the stock.  He did this by identifying a group of bank holding companies that were comparable to petitioner in the aggregate and looking at the prices for which their stock was selling.  He limited his selection criteria to exchange listed banks and he chose only midwestern banks, relying on the SNL Financial classifications of banks into broad geographic regions that share economic prospects.  1-P-108.  The midwest region comprises 13 states and, in Pommerening's opinion, its banks tend to trade at comparable levels because of their shared economic characteristics.  <u>Id</u>.  Pommerening believes that this opinion is supported by SNL's tracking, which shows a distinctive and consistent correlation between pricing and region of the country.  1-P-108-09.

      (In a rebuttal report, Pommerening analyzed transactions by regions and discovered that nonperforming assets as a percentage of total assets of publicly traded companies in the Midwest was 2.25%, close to petitioner's 2.29% of nonperforming assets to total assets.  This percentage was higher than three other regions of the country, close to the western region and well below the southeast.  Exh. 3 to Tr. Exh. 3.  This information was additional evidence to Pommerening that the midwest region was similar in mergers and acquisitions data and was priced at the lower end of the market in terms of price to book value and price to earnings multiples.  3-P-33.

      As more confirmation of lower acquisition prices in the midwest, Pommerening included in his rebuttal report a chart indicating that the midlevel institutions that sold in

the midwest were priced at the lower end of the scale, with the average price to tangible book value 103%, whereas the average in the New England region was 133% and the average in the southwest was 156%. 3-P-33 & Tr. Exh. 3, internal p. 8. Pommerening is not aware of any appraisal company that has stopped using regional differences or geography as part of its methods of developing comparables. 3-A-34. Pommerening prepared another chart showing the median price to tangible book value for midwest companies for each quarter for the four years ending December 2011 that shows the median price declining relative to tangible book value between the third and fourth quarters of 2011. 3-A-34 & Exh. 6 to Tr. Exh. 3.)

The asset size class Pommerening chose for his guideline public companies ranged from $350 million to $900 million. 1-P-106. The average and the median asset sizes for the guideline public companies were somewhere about $600 million; about $50 million more than petitioner's asset size of $550 million. 1-P-111.

Petitioner's return on assets trailing 12 months ending November 30, 2011 was .62% of assets, whereas the median of the guideline public companies was between .6 and .7% of assets. 1-P-111. Pommerening chose only companies that were profitable on a trailing 12-month basis so as to exclude severely troubled companies. 1-P-106-07. One of Pommerening's choices was a company known as Camco Financial, which had a return on equity of less than 1%, which was far below the other companies and below petitioner as well, but which Pommerening found useful as a means of capturing the elevated credit risk built into petitioner's balance sheet. Had he eliminated it, the credit quality of the guideline

17

group would have improved and he would have had to make a qualitative adjustment to get the right number.

In terms of nonperforming assets to assets, petitioner had a ratio of 2.3%, with the average and median for the guideline public companies about 2.3% and 1.8%.  1-P-112. Return on equity was strongly comparable, with the guideline companies slightly higher. Asset size, asset quality and regional market area were all comparable.  Id.

Pommerening noted that although petitioner's credit quality was improving, its .62% return on assets included a recapture of loan loss reserve of $1.1 million, which was a one-time income item.  Eliminating it would show a return on assets for petitioner lower than the guideline group.  1-P-113.  He was still comfortable about his use of the pricing of the guideline companies, treating the improvement in quality as an upward adjustment and the recapture of loan loss reserve as a downward adjustment.   Id.

Pommerening concluded that the *public equivalent value* of petitioner's shares was $554 a share on a minority basis, taking into consideration that petitioner's tangible equity-to-assets ratio was 9.9%, higher than either the median (8.63%) or the average (8.75%) of the guideline companies and its 6.2% return on average assets was a close match to the average (.68%) and median (.63%) of the guideline companies. 2-A-7.

Petitioner's return on average equity was 5%, which was lower than both the average (7.62%) and median (7.37%) of the guideline companies.  Tr. Exh. 1 at internal p. 5.  Its ratio of nonperforming assets divided by assets was 2.29% compared to the average (2.28%) and median (1.79%) of the guideline companies.  2-A-8.  On reserve coverage, petitioner did

18

not compare well to the group: its coverage was only 32%, whereas the average was 80.87% and the median was 61.18%. 2-A-8-9, Tr. Exh. 1 at internal p.5. Pommerening found this low coverage "less attractive than the guideline public companies," 2-A-9, but he did not discount petitioner for its relatively low reserve coverage, 3-P-40, noting that the company had been through a regulatory enforcement action, which led him to believe that the reserves were adequate. Id.

Pommerening believed that the differences in particular areas balanced each other out and that the comparable group formed a good basis for deriving value. 2-A-10. He then applied the group's pricing information as of December 29, 2011 to petitioner's November 30 financial data, 2-A-12-13, and took the arithmetic average of the average and median scores to arrive at a value of $554 per share, on the theory that if on average the peer group stock was trading at 76.15% of its tangible book value and petitioner's stock were trading on an exchange at the same 76.15% ratio, its price would be $579.26. 2-A-13. Pommerening then applied the market pricing ratios of the guideline public companies directly to petitioner's price to tangible book value ratio and its price to earnings multiple, concluding that $554.36 was the public equivalent value of petitioner's stock or, in other words, the value of a minority interest in petitioner. Id. & Tr. Exh. 1 at 5-6.

2. Acquisition premium method

To determine the control and synergy value that would be present in an acquisition, Pommerening applied the *acquisition premium method* to the public equivalent value of $554,

19

which required him to estimate the premium above the trading price of a company a buyer would be willing to pay to acquire a controlling interest and gain access to all of the cost-saving opportunities from consolidation.  2-A-14.  Pommerening looked for acquisitions that involved a publicly traded, exchange listed company and both a known pre-announcement price and a known acquisition price and was able to find 21 transactions that fit his criteria.

Pommerening did not select the companies for his acquisition premium method by geographic regions for two reasons:  the midwest region had only one acquisition during the relevant period and he considered regional economic conditions unimportant for this method because he was measuring the differences between prices (the incremental value), not the prices themselves.  2-A-16.  The median difference between the deal value at announcement of the impending sale and the actual sale price was 49%; the average was 52%.  2-A-15.  Applying a 50% acquisition premium to the $554 he had found to be the public equivalent value of petitioner's shares, he arrived at an acquisition price of $831.  2-A-18.

3. Pommerening's comparable transaction method

The *comparable transaction method* uses as pricing metrics the prices that were paid in actual acquisition transactions.  Pommerening found eight comparable transactions involving midwestern banks or thrifts that were sold in the two-year period before December 29, 2011, had assets between $100 million to $1 billion and a return-on-average assets of between 0% to 1%.  2-A-21.  Although thrifts, or savings banks, have been treated differently from banks historically because of their different regulators and different charters, Pommerening believes

20

that the differences between them have diminished in recent years, as banks moved into residential and real estate secured lending and thrifts went into commercial and industrial lending. 2-A-23. In the two years preceding petitioner's conversion, the thrifts and banks had had closely comparable average ratios of price to book value: in 2010, the average ratios were 109.7% for commercial banks and 113.5% for thrifts; in 2011, the situation was reversed: the average ratios were 101.8% for commercial banks and 96.9% for thrifts.

In analyzing the transactions, Pommerening used three ratios that he considered the most relevant to a valuation of a bank in an acquisition: price-to-tangible book value ratio; price-to-earnings multiple; and core deposit premium (also known as tangible book value premium to core deposits). (The latter premium is one he believes is a proxy for a customer base. It is defined as reported deposits not including deposits larger than $99,999. 2-A-26.) Applying these three ratios to petitioner, Pommerening derived an acquisition value of $829 a share for a whole-bank transaction. 2-A-26-27.

His next step was to determine the control value, knowing it would be something less than the full acquisition price because that price would include synergistic benefits that did not exist in petitioner's conversion. 2-A-27-29. With $554 the lower bound, he halved the difference between $831 and $829 to get $830 for the upper bound for full acquisition price and then calculated where fair value would lie between those two bounds. To assess how much continuing shareholders would pay to buy out a minority, he looked at public companies in which a majority of shareholders had bought out a minority and gone private. 2-A-29. He took the one-third of these transactions in which the highest premiums had been

21

paid, calculated the average, which was 32% and the median, which was 28%, and decided that 30% was a fair premium to apply to petitioner's stock to represent the control component.  2-A-30.  Adding 30% to $554 brought the fair value to $720.

Respondents' expert, David Harris, challenged this determination, saying that Pommerening had included transactions that went back as far as 2010, ignoring the upward movement in pricing through 2011, especially in the midwest.  3-P-14.  However, Harris does not say how the inclusion of these transactions would have influenced the average and median premiums that Pommerening derived.  Given Pommerening's use of only the top third of the transactions in which the highest premiums had been paid, it may not have had any effect on the premium number.

In a rebuttal report, Pommerening tried to calculate a current earnings power for petitioner based upon financial statement data and historical ratios, applying the same assumptions that Harris used for loan losses and tax rates.  3-A-30.  His aim was to do his own recurring earnings analysis to see whether he could confirm Harris's opinion that petitioner would have $4.5 million in current earnings.  Pommerening's analysis showed a declining earnings power for petitioner that went from $4.6 million at the end of 2009 to $3.6 million to about $2.1 million for the trailing 12 months ending November 30, 2011.  3-P-31 & Exh. 1 to Tr. Exh. 3.  This was consistent with the basic operating income ratios Harris included in his report, which were declining from 2007-2011.  3-A-31.

In selecting his comparables, Pommerening considered credit quality because the value of banks is related directly to their credit quality and that companies with high

22

nonperforming assets tend to trade at low levels.   3-P-35.   In Exh. 4 to Tr. Exh. 3, Pommerening sorted the industry by declining nonperforming assets to total assets and broke them into five components.   In the middle component, which was closest to petitioner's nonperforming assets to total assets, the median price to tangible book value was 76.6%, whereas the median for companies with lower percentages of median price to tangible book value was a price to tangible book value of 90 to 99%.   3-P-36.

Pommerening prepared a table showing how his list of comparables compared to Harris's.   Table 2, Tr. Exh. 3, internal p. 7.

### Harris Report
### Comparison of Harris Report and RP Financial Report Guideline Public Companies

| | Averages Guideline Public Companies | | |
|---|---|---|---|
| | HARRIS | RP FINANCIAL | NBI(1) |
| Number of Institutions | 16 | 14 | |
| Assets ($000) | $634,173.00 | $626,024.00 | $553,498.00 |
| Tangible equity/assets (%) | 10.06% | 8.75% | 9.90% |
| Return on average assets (%) | 0.91% | 0.68% | 0.62% |
| Return on average equity (%) | 8.60% | 7.62% | 5.60% |
| NPAs/assets (%) | 1.79% | 2.28% | 2.29% |
| Reserve coverage | 79.20% | 80.87% | 32.05% |
| Market pricing ratios | | | |
| PTB - Price/tangible book value (%) | 102.47% | 76.15% | na |

| PE - Price/trailing twelve month net income (x) | 11.47 | 11.37 | na |
|---|---|---|---|

As the table shows, the average assets for the companies that he and Harris chose were higher than for petitioner; Harris's group had a higher average in tangible equity to assets and Pommerening's was slightly lower; both groups had a higher return on average assets than petitioner, although Pommerening's group's average of 68% was closer to petitioner's 62% than Harris's group average of 91%; Harris's group had a lower average rate of nonperforming assets to assets than petitioner, whereas the average of Pommerening's group was almost the same as petitioner's; both groups had an average reserve coverage more than twice as high as petitioner's.

## C. David Harris

David Harris is a principal in the business valuation and consulting firm, Southard Financial.  Jt. pretrial statement, dkt. #71, at 2.  He has more than 27 years of experience in valuing business interests and more than 22 years of valuing financial institutions, both banks and thrifts.  Id. & 2-P-51.  He has given fair value opinions under the Wisconsin standard.  2-P-52.

Harris gathered extensive information for his report.  He did not meet with petitioner's management, but either listened to depositions of those people or read the deposition transcripts.  Harris used two of the three basic approaches:  income and market.

24

Id. at 55. Like Mecredy and Pommerening, he did not use the asset-size approach. He always considers the income approach when valuing a bank but does not necessarily put any weight on this approach, particularly if the bank has been losing money and there is no income stream to capitalize. 2-P-56. Using the income approach allows him to get another perspective, taking into account the required rate of return that an investor would require for a set of cash flows. 2-P-57. He has never seen an appraisal firm that did not use the income approach in valuing a bank that was not in financial distress, other than those whose representatives gave opinions in this case. Id.

Harris also used a market approach, although he noted that it has the shortcoming that no particular group of public companies is going to be perfectly representative of the particular bank being valued. 2-P-60-61. This shortcoming can be controlled if the evaluator is selective in the criteria used to derive the comparable companies from the database. If this is done, the market approach can be the most powerful one available. 2-P-60. Nevertheless, he never puts 100 percent weight on the market approach unless the subject company is losing money. 2-P-61.

Harris testified that his firm had stopped using geography as a "key input" in choosing guideline bank companies several years earlier, 3-A-32, and that his firm's data showed a direct correlation between return-on-equity and price-to-book value ratios and between return-on-equity and price-to-earnings ratios, but little correlation within SNL Financial's geographic regions. 2-P-65. However, he could not cite any study that the firm had undertaken or reviewed. At his pretrial deposition, Harris testified that he had not done

25

any analysis to determine whether the stock price performance of banks based on certain factors varies by geography and that he was not aware of any studies done by others on this topic. 3-A-33. He acknowledged that he had used geography as a criterion in 2007, when he was valuing respondents' bank in Eau Claire, Wisconsin, using for comparables a "subset of all banks that are in Wisconsin and contiguous states and Indiana." Tr. Exh. at 17. At this trial, he admitted he could not think of any reason why it would be appropriate to do a geographic sort when valuing a bank in Eau Claire, Wisconsin and not to do one when valuing a bank in Superior, Wisconsin. 3-A-33.

## 1. Income approach

Ordinarily, when he begins an income approach, Harris estimates the ongoing earnings of the business or some projected cash flows. 2-P-66. In this case, he did not have sufficient information to use projections so he used a second method, which involved determining petitioner's "anticipated benefits," or ongoing earnings. Id. For this method, he used the years 2007-2011 and showed petitioner's basic operating income (income before taxes, before loan loss provisions and securities transactions) in each year as a percentage of average assets. He adjusted this income slightly in each year for nonrecurring, one-time events (primarily gains and losses on the sale of real property securing a loan that had to be repossessed and sold when the loan failed) to show the actual ongoing earnings of the bank free of any extraordinary items. 2-P-67-68. For 2011, he added back in the $2.2 million impairment of goodwill that the bank had taken that year after deciding that its 2008

26

acquisition of Community Bank in Duluth did not result in as much goodwill as anticipated. 2-P-68-69.  He then averaged the five numbers shown as basic operating income, giving the most weight to the income earned in the most recent year.  His result was 1.73% of average assets.  2-P-70, 72.  (He testified that income had been trending downward since 2007, in large part because of the acquisition of Community Bank, 2-P-71; presumably another factor was the 2008 recession.)  He then normalized petitioner's loan losses to what would be anticipated over time by taking an average of petitioner's peer level companies adjusted to reflect petitioner's level of loans as a percentage of assets.  2-P-73.  He subtracted this loan loss provision to obtain an estimated ongoing pretax return on average assets and applied the percentage to the most recent quarter's average assets ($542,328,000), giving him a result of about $7,800,000.  2-P-73.  Harris subtracted petitioner's expense structure aside from the bank ($650,000) to derive a pretax income of $7,159,000. 2-P-73-74.  Using a tax rate in the 38% range, he estimated that the bank would have after tax earnings of $4.46 million. 2-P-74-75.

Harris then calculated a capitalization rate, starting with a level of risk that was essentially zero and adding in risk factors to get to the investor's required rate of return.  2-P-77.  He compared the average earnings of publicly traded stocks since 1926 to determine that they had earned on average 5.5% more than the 2.6% risk-free rate offered by the United States Government for long term bonds, or 8.1%.  2-P-77-78.  He calculated a .75 beta coefficient that was contemporaneous with the valuation date of petitioner's stock by looking at sales of bank stock and assuming that the historical stability of banks justified a

27

beta less than 1.  2-P-78-79.   Applying this coefficient brought the 8.1% figure down to 6.7%, which was the adjusted equity risk premium.   2-P-79.

Acknowledging that smaller banks are riskier and require a greater return, Harris determined from published information from Morningstar that petitioner's size risk premium was 6.7%.  2-P-80.  (The 6.7% size risk premium should not be confused with the adjusted equity risk premium.)  The size risk premium came from a table that separates publicly traded companies into deciles.  Exh. 2 to tr. exh. #3.  The largest companies are in decile 1, which has a size risk premium of -0.38%; the smallest are in decile 10, which has a size risk premium of 6.7%.  Each decile includes a wide range of companies.  For example, decile 1 includes companies with market capitalizations ranging from $1,621,096,000,000 to $6,896,389,000,000.  Decile 10 includes companies with capitalizations as small as $1 million and as large as $207 million.  If Harris had used the size risk premium for the particular group within the tenth decile in which petitioner fell ($87 million in total capitalization and smaller), the size risk premium would have been 11.77%, which would have caused his estimated value of a share to drop $920 to under $600.  3-A-27 & Exh. 2 to Tr. Exh. 3.  Harris testified that he did not use this group because it includes very small companies with capitalizations as low as $1 million dollars that are too variable to be reliable, particularly because one large trade can affect the price dramatically.  3-A-28.  Had he used the next highest group within the decile, he would have avoided this concern.  In that case, the value of a share would have dropped to $727.

Harris used his professional judgment to assess the specific risks of owning

28

petitioner's stock compared to the stock of other small publicly traded banks, concluding that the risk factor was 0%, given petitioner's dominant market position in Douglas County (56% of all deposits), its opportunity for growth in Duluth and in St. Louis County in Minnesota, its recent emergence from a formal agreement, its ability to digest the Community Bank acquisition and its profitability over the preceding two years. 2-P-81.

Harris's capitalization rate was 8.4%. 2-P-84. To convert that rate to a price earnings multiple, he divided 1 by the capitalization rate. Id. His next step was to add an enterprise premium, which he concluded should be 25%. 2-P-84-86. Multiplying petitioner's anticipated benefits of $4.46 million by an adjusted capitalization factor of 14.88% produced a valuation of $66.36 million or $922 a share. 2-P-88.

2. Market approach

Harris considered three market approach methods, but abandoned one (the transactions in the company's stock method) because he did not believe that he could obtain a sufficient volume of transactions in petitioner's stock to give him a useful indication of value. 2-P-93.

a. Guideline public company method

For the guideline public company method, Harris began by establishing criteria to sort an SNL Financial database that would be relevant to petitioner in terms of size ($250 million to $1.5 billion in assets), return on assets (.7% to 1.1%), return on equity (7 to

29

10%), equity to assets (10 to 12%), nonperforming assets as a percentage of total assets (1 to 5%) and a minimum of 500 shares a day of average daily trading volume.  2-P-94-95.  He was able to find 16 commercial banks that met those criteria.  2-P-94; Tr. Exh. 501, at 40.

The figures that Harris used for petitioner's return on average equity and return on average assets were not based on the actual figures for 2011 but on the anticipated benefits he had calculated from petitioner's projections.  2-P-95-96.  For the publicly traded guideline companies, he based the returns on actual earnings for the trailing 12 months.  2-P-96.  He justified doing so on the assumption that the information about these companies is transparent and complete, so that the prices at which they are trading reflect the same kinds of adjustments he made to petitioner's earnings.  2-P-97.  In his opinion, petitioner's ratios fell well within the ranges of the guideline public company group.  Tr. Exh. 501, at 24.

From the guideline company multiples, Harris determined what he considered to be the appropriate capitalization factors for petitioner: 14.0 times earnings, 115% of book value, 122% of tangible book value and 12.1% of assets.  Tr. Exh. 501 at 25.  These multiples were the medians of the guideline public companies plus the enterprise premium of 25%.  Id.  Applying these factors yielded values in the range of $867 to $940 a share.  2-P-98.  Giving equal weight to the four values, his weighted average value was $914 a share. Id.

b. Guideline transaction method

When it came to transactions, Harris was unable to find a representative group in his

database of transactions that met the criteria he had used for his other method.  2-P-102.

Instead, he found six banks that had not been included in the first guideline group because

they did not fit one or two of the criteria but were close to meeting them.  2-P-103.  For

instance, two of the banks had total assets in excess of Harris's desired bound of $1.5 billion;

one bank was slightly below his lower bound of $240 million.  Id.  Two banks had equity-to-

assets of slightly above 10 to 12; two were slightly below.  2-P-103-04.  Three banks were

slightly below his criteria for profitability.  If he had narrowed his group to midwestern

banks, he would not have had any that met his original criteria.  2-P-104.  Harris adjusted

the prices by deducting a synergistic premium of 20%, taking an additional 15% discount

on the price-to-earnings multiple to account for the lower earnings of three of the guideline

banks and a 20% discount to reverse the 25% control premium.  2-P-104-07.

Harris had less confidence in his guideline transaction method than he had in his

guideline public company method, but when he assessed all three of his valuation methods

together and weighted them, he came up with the same value.  His income approach

produced a value of $922 a share; his market approach produced a value of $914 a share

using the guideline public company method; and his second market approach using the

guideline transactions method produced a value of $905 a share. 2-P-108, Tr. Exh. 501-028.

He weighted his income approach at 40%, the guideline public company method of the

market approach at 50% and the transactions method of the market approach at 10%.  2-P-

108-09.  His average price was $916.  2-P-109.

31

3. Earning power

Petitioner's actual return on average assets over the six years ending December 2011 has ranged from a high of 1.48% in 2007 to a low of .16% in both 2009 and 2010.  3-A-19. Harris calculated that this equaled an earning power of .90% and that petitioner's after tax earnings would be $4.46 million, and he used this latter number as part of the income approach *and* the market approach.  If the earning power number were lower than .90%, it would affect Harris's value conclusion on both his income and market approaches.  3-A-20.

OPINION

Under Wis. Stat. § 180.1330, the court is to determine the fair value of respondents' shares. Wis. Stat. § 180.1330 does not specify how courts are supposed to determine the fair value of a corporation's shares.  The statute defines "fair value" with respect to a dissenters' shares as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable."  Wis. Stat. § 180.1301.  The Wisconsin Supreme Court has stated that "fair value" means the "net worth of a closely held corporation, divided by the number of shares," Northern Air Services, Inc. v. Link, 2011 WI 75, ¶ 13 n. 6, 336 Wis. 2d 1, 804 N.W.2d 458, that determining fair value is a "fact-specific process," HMO-W v. SSM Health Care System, 2000 WI 46, ¶ 55, 234 Wis. 2d 707, 611 N.W.2d 250, and that courts "must consider 'all relevant factors.'"  Id. at ¶ 53 (citing

Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del. 1983) (providing a list of relevant factors, including market value, asset value, dividends, earning prospects, nature of enterprise, future prospects and any other facts)).

Courts are not equipped to make their own evaluation of fair value. Instead, they must decide from the presentations of expert witnesses which determination of fair value stands up best to close examination, which is what I will do. After that, it will be necessary to decide the interest petitioner must pay respondents for the period between December 29, 2011 and January 12, 2012, when the payments were made. Finally, both sides have asserted the right to an award of fees and costs from the other under Wis. Stat. § 180.1331. Respondents say that they are entitled to such an award because petitioner did not comply substantially with §§ 180.1320 through 180.1328; petitioner asserts that respondents acted arbitrarily, vexatiously or not in good faith in demanding an inflated value for their shares under § 180.1328.


A. Fair Value

For a number of reasons, I find that William Pommerening's evaluation is the more reliable of the two experts who prepared reports for trial. The reliability of Harris's work is undercut by several factors, beginning with his tendency to make most, if not all of his judgment calls in favor of a higher share price. This was not true of either Pommerening or Mecredy. Moreover, Harris ignored geography in choosing companies to compare with petitioner; the comparable companies he chose outperformed petitioner in all respects; he

33

calculated an unrealistically high "earning power" for petitioner which was helped by his use of 2007 pre-recession earnings and an overly positive view of petitioner's prospects for a dramatic turnaround in 2012; he used his unrealistic assessment of earning power in both his income and market approaches; he chose a size risk premium that increased petitioner's value when he could have used a more appropriate one; and he used a questionable specific risk factor.

At trial, petitioner made a strong case for regional pricing differences among companies, whereas Harris gave it no consideration. Both of petitioner's experts, Mecredy and Pommerening, chose their comparables by geography for their market approach analysis. Harris disdained use of geographic regions. His opinion on this topic might have had some weight had he cited any studies that he or his firm had done or relied upon or if he could have explained why he had relied on regional pricing when he valued respondents' bank, Charter Bank of Eau Claire, when it was going through its own Subchapter S conversion in 2007. He attempted to explain why he did not find it appropriate for use in 2012, when he was evaluating petitioner's stock, but his explanation was not convincing.

When it came to selecting comparable guideline companies to undertake a market approach analysis, Harris included four from the region and 12 more from outside it, then compounded the differences between his group of comparables and petitioner by choosing banks that outperformed petitioner in each category: tangible equity to assets; return on average assets; return on average equity; non-performing assets to assets; and reserve coverage. Harris's nongeographical group had an average price to tangible book value of

34

102.47% while Pommerening's geographical group had an average of 76.15% and approximated petitioner much more closely, with the one exception of tangible equity to assets.  3-P-37-39.

|  | Assets | Tangible Equity/ Assets | Return on Average Assets (ROAA) | Return on Average Equity (ROAE) | Non-Performing Assets (NPAs)/ Assets | Reserve Coverage |
|---|---|---|---|---|---|---|
| NATCOM (Nov. 30, 2011) | 553,498 | 9.9 | 0.62 | 5.60 | 2.29 | 32.05% |
| Pomm. Med. | 666,201 | 8.63 | 0.63 | 7.37 | 1.79 | 51.58% |
| Pomm. Avg. | 626,024 | 8.75 | 0.68 | 7.62 | 2.28 | 80.87% |
|  |  |  |  |  |  |  |
| Harris Med. | 809,905 |  | 0.92 | 8.77 | 1.56 | 66.35% |
| Harris Avg. | 805,254 | 10.06% | 0.91 | 8.60 | 1.79 | 79.20% |

The result was that both groups were skewed towards respondents' higher value, but the effect of Pommerening's comparables was not nearly as favorable for respondents as was the effect of Harris's.  In fact, when it came to return on average assets and return on average equity, Harris set the starting range of his comparables so high (.7% to 1.96% and 7% to 10%, respectively) as to exclude petitioner altogether.

Harris also used unrealistic earnings assumptions that affected his market approach. He assumed that petitioner had an annual earnings power of $4,460,000 at the end of 2011, although it had never earned more than $3.4 million in the three post-recession years leading

35

up to 2011. It had earned $3.4 million in the trailing 12 months before the earnings date but that amount included a recapture of loan loss reserve of $1.1 million, which was a one-time income item. Harris reached his assumption of $4,460,000 despite the fact that earnings of $4,460,000 would amount to a 0.9% return on average assets, which would be an unusual and significant improvement over the preceding three years, in which petitioner had had a return on average assets of 0.16% in both 2009 and 2010 and 0.35% in 2011. Harris's own report showed that petitioner's basic operating income had declined in every year since 2007. It is true, as he explained, that the decline was itself declining over the years, which made it reasonable for him to have accorded somewhat more weight to recent years' earnings, as he did. Tr. Exh. 501 at 501-019. Nevertheless, it is not plausible to expect that in 2012 petitioner would start earning returns on average assets more than two and one-half times higher than in the preceding year, even if Harris was right about its having reached its last year of declining earnings power.

If Harris's earning power assumption is reduced from $4.46 million to $2.8 million, which is the composite of the 2010 and 2011 earnings power ($3.6 million earnings power in 2010 and $2,067,000 in 2011, giving the two years equal weight), Harris's per share value would drop to $578.67. It would drop to $744.00 if Harris used the 2010 earnings power of $3.6 million; it would drop to $702.67 if he used the 2011 earnings power for the trailing twelve months without adjusting for the reversal of loan loss provisions. Harris compounded the effect of his overly optimistic earning power assumption by incorporating it into both his income and market approaches.

36

Harris also used a size risk factor that was inappropriate.  His decision not to tailor the size risk factor to the specific group within the decile in which petitioner fell does not give me confidence about his approach in general.

Finally, Harris used a specific risk factor that is questionable.  He assessed the 0% risk factor for publicly traded bank companies, although petitioner is not publicly traded, saying that the risk factor was justified because petitioner had "positives" in the form of a dominant market position in Superior and chances for growth in Duluth, a community it had just entered.  He did not mention that Superior is a city of only 27,256 that has lost population in the last 10 years.

Pommerening limited himself to a market approach, bypassing the income approach that both Harris and Mecredy used.  Harris criticized this as a deviation from the standards of the American Society of Appraisers, which say that the approach should be considered in every valuation.  However, I am persuaded by Pommerening's explanation that the market approach is preferable in situations like this one because it is based on actual prices being paid by investors in arm's length transactions and therefore, is a good estimate of the market's expectations on capitalization or earnings and multiples of book values derived from the sheer number of individuals making investment decisions each day.  In his opinion, the income approach depends too heavily on the appraiser's subjective decisions and is easily influenced by small changes in assumptions.  Mecredy recognized this in part, by giving his income approach a weight of only 20% in his overall evaluation, as compared to Harris's weight of 40%.

37

In sum, although all of the expert reports are subject to criticism of one form or another, which may be expected in light of the subjective nature of the undertaking, I am persuaded that Pommerening's evaluation makes is the most reliable.  I conclude therefore that petitioner's payment to respondents of $780 meets the fair value standard set in § 180.1330.

## B. Interest

As determined in the February 19, 2012 order denying petitioner's motion for summary judgment and granting respondents' motion, dkt. #61, petitioner is responsible for paying respondents interest on the fair value of their shares for the period between December 29, 2012, when the conversion was effectuated, until January 20, 2012.  Wis. Stat. § 180.1301(5).  The rate is "the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all the circumstances."  Id.

 The parties dispute whether petitioner has principal bank loans, but it is not necessary to reach that question.  I will award interest at the prime rate of 3.25% on the value of the shares for the period before January 20, 2012 and on the amount of interest withheld since December 29, 2012.  No more is required.  3.25% is the amount that respondents asked for in their February 2012 payment demands and they failed to respond to petitioner's discovery request to state the interest rate they believed should apply.  They said nothing about interest until they filed their  trial brief, which was too late.

38

C. <u>Fees and Costs</u>

1. <u>Petitioner's conduct</u>

Respondents have failed to show that petitioner acted arbitrarily, vexatiously or in bad faith.  To the contrary, it followed the procedure set out in the Wisconsin statutes. Anticipating that respondents might oppose the conversion, it hired an appraisal firm experienced in valuations of community banks and a law firm that told petitioner that it had a good relationship with Brenda Johnson and Murray Johnson.  A member of the firm met with them to explain the conversion and to tell them that if they opposed it, it would not go through.  The chairman of petitioner's board, James Jarocki, met with both Brenda and Murray and tried to persuade them of the advantages of the conversion.  He also told them that the plan would not go through if they opposed it.  He and the other board members believed this up until late October when they saw a means of financing the conversion even if Brenda and Murray opposed it.  Both Brenda and Murray were familiar with conversions, having converted their own bank in Eau Claire from a Subchapter C corporation to a Subchapter S corporation several years earlier.  In addition to the personal meetings, Jarocki provided copies of Mecredy's appraisal to both Brenda and Murray shortly after receiving it.

Respondents' claims about petitioner's purported bad faith are unsupported.  First, to the extent that respondents believe that the appraisals that petitioner obtained demonstrate its bad faith, I have found that those appraisals are more reliable than the one undertaken on respondents' behalf.  Those appraisals cannot serve to demonstrate that petitioner acted in bad faith

39

Second, it was not arbitrary to add $30 to the value of a share to represent the improvement in petitioner's financial performance without undertaking a new appraisal. The increase was more than reasonable; had petitioner's board had Pommerening's report before it at the time, it might not have thought any increase was necessary. In any event, respondents never objected to the $30 increase at the time; they too thought that an adjustment should be made to account for the improved earnings since June 30, 2011.

Third, it was not arbitrary for petitioner's board to reject respondents' demand in their December 16, 2011 letter for a higher share price and to view it as simply a bargaining tool. Finally, it was a mistake for petitioner to withhold interest when they paid respondents for their shares, but it was not an arbitrary or vexatious act. Petitioner relied on legal advice that turned out to be different from what this court held. In any event, the mistaken withholding of interest is an easily remediable error, not one that would give rise to a finding of vexatiousness or bad faith.

## 2. Respondents' conduct

Petitioner contends that respondents acted in bad faith but I disagree. Petitioner says that they had no legitimate reason to oppose the conversion, after having converted their own bank earlier. It contends that respondents took their actions because they wanted to thwart their brother and, in Murray Johnson's case, because he wanted to have two seats on petitioner's board, which had been denied him. Alternatively, or in addition, petitioner maintains that respondents wanted to use petitioner's desire for the conversion and its need

40

to fund the buyout of dissenters as a means of obtaining more money from petitioner.

Petitioner cites nothing in the statutes that requires dissenters to base their dissent on a legitimate business reason or that forbids them from holding out for a higher price for their shares. I found Harris's appraisal less reliable then Pommerening's and disagreed with his judgments but I did not find Harris's opinion so lacking as to support a finding of bad faith on the part of respondents.

Finally, petitioner contends that respondents used their rights under the Wisconsin statutes to pursue a personal vendetta against their brother. It is not necessary to delve into that question; it is only the parties' actions that are relevant. Those actions demonstrate a desire on respondents' part to get the highest possible price for their stock. In and of itself, this is not an indication of bad faith; it is the reason for the legislation on the subject.


ORDER

IT IS ORDERED that

1. The fair value of a share of petitioner National Bank of Commerce's stock was $780 as of December 2011;

2. Respondents Brenda Johnson, Murray Johnson, Diana T. Johnson, and minors T.R.M., M.P.J., M.S.J. and T.P.J. are entitled to interest on the value of their shares for the period from December 29, 2011 to January 20, 2012 and to interest on the unpaid interest at the rate of 3.25% from January 20, 2012 until payment is made;

3. Petitioner did not act arbitrarily, vexatiously or in bad faith in its treatment of

41

respondents in connection with petitioner's conversion from a Subchapter C corporation to a Subchapter S corporation;

4. Respondents did not act in bad faith in connection with their exercise of their dissenters' rights; and

5. Petitioner's objections to the admission of respondents' exhibits 534 and 549 are sustained on the ground of relevance. The exhibit list is amended to show that Exhibits 615 and 616 are received, with the exception of the answer to interrogatory no. 14 of exhibit 615 and the answer to interrogatory no. 1 of exhibit 616. Exhibits 510, 514, 550, 560, 600-603, 606-07, 620 and 624 are not in evidence.

The clerk of court is directed to enter judgment in accordance with this order and close this case.

Entered this 12th day of June, 2013.

BY THE COURT:

/s/
BARBARA B. CRABB
District Judge

42